**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| COMPUTERIZED ASSESSMENTS<br>& LEARNING, LLC,<br><br>                  **Plaintiff,**<br><br>v.<br><br>DATA RECOGNITION CORPORATION,<br><br><br>                  **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **CIVIL ACTION**<br>     **No. 09-2400-KHV** |

## MEMORANDUM AND ORDER

Computerized Assessments & Learning, LLC, brings this diversity suit against Data Recognition Corporation for specific performance, breach of contract and promissory estoppel. This matter comes before the Court on <u>Defendant's Motion To (1) Dismiss Plaintiff's Complaint Under Rules 12(b)(1) and (3); (2) Transfer The Case To The United States District Court For The District Of Minnesota; Or In The Alternative (3) To Compel Arbitration Under The Federal Arbitration Act</u> (Doc. #7) filed August 18, 2009.  For reasons set forth below, the Court sustains defendant's motion in part.

### <u>Factual Background</u>[1]

Plaintiff's complaint and the documents to which it refers are summarized in pertinent part as follows:

---

[1]      For purposes of this motion, defendant accepts as true the facts set forth in plaintiff's complaint.

Data Recognition Corporation ("DRC") is a Minnesota corporation with its principal place of business in Minnesota. DRC provides pencil and paper educational services and tests to governmental entities. Computerized Assessments & Learning, LLC ("CAL") is a limited liability company formed under the laws of the Kansas with its principal place of business in Lawrence, Kansas. CAL creates and implements online testing services for governmental entities.

In 2008, DRC and CAL entered into a Teaming Agreement to work together to submit joint responses to requests for proposals from state entities seeking educational testing services. DRC drafted the Teaming Agreement. The terms of the Teaming Agreement provide a process by which the parties decide whether and how to submit a joint proposal.

The Teaming Agreement contains an arbitration clause which provides as follows:

> Any disagreement or dispute arising from or relating to the negotiation, formation or performance of this Teaming Agreement, including any attachment or exhibit hereto, shall be exclusively subject to decision in arbitration under the rules of the American Arbitration Association. The forum for the arbitration shall be in Hennepin County, Minnesota. This Teaming Agreement shall be subject to and governed by the laws of the state of Minnesota.

See Doc. #8-1, ¶ 14.[2]

As a result of proposals created through the Teaming Agreement, CAL and DRC have entered a series of contracts with seven states: Alaska, Idaho, Nebraska, Oklahoma, Pennsylvania, South Carolina and Washington. The Pennsylvania contract between DRC and CAL is the subject of this lawsuit.

On August 28, 2008 the Pennsylvania Department of General Services issued a request for proposals for the development of Graduation Competency Assessments ("GCA"), a Diagnostic

---

[2] The Teaming Agreement also contains confidentiality, non-compete and indemnity provisions.

Assessment Tool ("DAT") and corresponding Model Curricula. The request for proposals required offerors to submit specific cost information on a 15 page spreadsheet titled "Cost Submittal Document." Doc. #1, Ex. 1. The Cost Submittal Document specified tasks using descriptive words and phrases commonly used and understood in the educational testing industry. DRC asked CAL if it would submit a joint proposal for the GCA and DAT components. CAL agreed to prepare a subcontract proposal to perform GCA and DAT tasks for specified prices that matched specific line items in the Cost Submittal Document.

On October 9, 2008, CAL submitted its subcontract proposal to DRC. In turn, DRC incorporated CAL's subcontract proposal in its proposal. On December 22, 2008, Pennsylvania informed DRC that it had selected DRC's proposal for negotiation of a final contract. Over the next month, DRC and CAL worked together to compile a proposal. In January of 2009, CAL and DRC participated in two negotiation sessions with the Pennsylvania Department of General Services and Department of Education in Harrisburg, Pennsylvania. The purpose of these meetings was to negotiate the terms of DRC's final proposal to Pennsylvania, which DRC and CAL agreed would include CAL as a subcontractor for the GCA and DAT tasks. During these meetings, CAL presented its software, answered questions and discussed how it would meet the requirements which Pennsylvania identified in the request for proposals.

On February 2, 2009, in response to demands by DRC, CAL submitted to DRC a revised subcontract proposal with significantly lowered prices. DRC accepted the terms of the proposed subcontract, which contained a performance schedule and CAL's obligations under the subcontract, as well as pricing. On February 3, 2009, DRC incorporated CAL's proposed subcontract in its final submission to Pennsylvania.

Under the Teaming Agreement, because CAL adjusted its proposal to eliminate the reasons for DRC's rejection of the CAL proposal, DRC was precluded from using any other partner or subcontractor to perform the GCA and DAT tasks included in the CAL subcontract proposal for the Pennsylvania Contract. After DRC submitted a final proposed contract which included the CAL subcontract proposal, the CAL subcontract proposal became a binding subcontract between DRC and CAL (the "CAL Subcontract"), subject to the condition that Pennsylvania would award the prime contract to DRC.

After DRC accepted CAL's subcontract proposal, DRC encouraged CAL to hire additional personnel and otherwise prepare for the performance of the Pennsylvania Contract as DRC's subcontractor. DRC continued to represent to CAL and others that DRC and CAL had a valid subcontract and would perform the Pennsylvania Contract together.

On May 12, 2009, Pennsylvania accepted the DRC prime contract proposal for a total price of $201,119,255.50. Pennsylvania's award of the prime contract to DRC removed all conditions precedent to the parties' obligations under the CAL Subcontract, and the parties were then contractually bound to perform the CAL Subcontract.

On May 12, 2009, Pennsylvania issued a purchase order for $7,976,261.00 for the first period of performance of the Pennsylvania Contract, which included specific amounts for line items included in the CAL Subcontract.

Although Pennsylvania awarded DRC the prime contract on May 12, 2009, DRC did not inform CAL about the award until June 13, 2009, when DRC told CAL that it would not be using CAL for the Pennsylvania Contract – that DRC was going to "go it on our own."

DRC has stated that its decision to perform the Pennsylvania Contract on its own was not

in any way related to CAL's performance, skills, readiness or evaluation. CAL is ready, willing, and able to perform the CAL Subcontract as contemplated by the parties.

On July 28, 2009, CAL brought suit against DRC for specific performance and breach of the CAL Subcontract and for promissory estoppel. Defendant asks the Court to dismiss this action for lack of diversity jurisdiction or, alternatively, to dismiss the case pending arbitration, transfer the case to the United States District Court for the District of Minnesota or stay the action and compel arbitration.

## **Legal Standards**

Rule 12(b)(1), Fed. R. Civ. P., governs motions to dismiss for lack of subject matter jurisdiction. Because federal courts are courts of limited jurisdiction, the law imposes a presumption against jurisdiction. Marcus v. Kan. Dep't of Revenue, 170 F.3d 1305, 1309 (10th Cir. 1999). Plaintiff bears the burden of showing that jurisdiction is proper, and must demonstrate that the case should not be dismissed. See id.; Jensen v. Johnson County Youth Baseball League, 838 F.Supp. 1437, 1439-40 (D. Kan. 1993). Conclusory allegations of jurisdiction are not enough. Id.

Rule 12(b)(3) governs motions to dismiss for improper venue. "Venue" refers to the place where a lawsuit should be brought, and must be proper for each claim pleaded. Clemons v. Speigel, No. 94-4092-SAC, 1994 WL 732630, at *1 (D. Kan. Dec. 27, 1994). Once challenged, plaintiff must show that venue is proper in the forum state. Jet-Pro Co. v. Sweet Mfg. Co., Inc., No. 93-4059-SAC, 1993 WL 463512, at *8 (D. Kan. Oct. 27, 1993). The procedure to decide a motion to dismiss for improper venue is generally the same as deciding a motion to dismiss for lack of personal jurisdiction. Black & Veatch Constr., Inc. v. ABB Power Generation, Inc., 123 F. Supp.2d 569, 572 (D. Kan. 2000).

Courts apply a "summary-judgment-like standard" to motions to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. See, e.g., Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir. 2002) (same); Brown v. Dorsey & Whitney, LLP, 267 F. Supp.2d 61, 66-67 (D.D.C. 2003) (collecting cases). Although the Tenth Circuit has not precisely addressed this issue, this Court has no reason to believe that it would apply a different legal standard. Clutts v. Dillard's, Inc., 484 F. Supp.2d 1222, 1224 (D. Kan. 2007) (applying summary-judgment-like standard to motion to compel arbitration); see Gibson v. Wal-Mart Stores, Inc., 181 F.3d 1163, 1166 (10th Cir. 1999) (reviewing district court grant of motion to compel arbitration under summary judgment standard where parties agreed that standard applied); Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1283 (10th Cir. 1997) (district court must hold jury trial on existence of agreement to arbitrate where parties raise genuine issues of material fact regarding making of agreement to arbitrate).

Under this well-settled standard, the moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The movant need not negate the other party's claim, but rather must simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. Adams v. Am. Guar. & Lab. Ins. Co., 233 F.3d 1242, 1246 (10th Cir. 2002) (citing Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)). In the context of a motion to compel arbitration, this requires defendant to present evidence sufficient to demonstrate an enforceable agreement to arbitrate. See Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995).

Once defendant has done this, the burden shifts to plaintiff to demonstrate a genuine issue of material fact as to the making of the agreement to arbitrate. See Bensadoun, 316 F.3d at 175; Oppenheimer, 56 F.3d at 358. If plaintiff demonstrates a genuine issue of material fact, a trial on this issue is required. 9 U.S.C. § 4 (if making of arbitration agreement seriously disputed, court shall proceed summarily to trial of issue); Avedon Eng'g, 126 F.3d at 1283 (court must hold jury trial on existence of agreement to arbitrate where parties raise genuine issues of material fact regarding making of agreement to arbitrate).

**Analysis**

Defendant asks the Court to (1) dismiss this action for lack of diversity jurisdiction or alternatively – because the parties have an enforceable agreement to arbitrate in Minnesota – to (2) dismiss the case for lack of venue, (3) transfer the case to the United States District Court for the District of Minnesota or (4) stay the action and compel arbitration. Plaintiff opposes the motion, asserting that (1) it has presented evidence which demonstrates diversity jurisdiction and (2) defendant has not shown an enforceable agreement to arbitrate.

I.      Motion To Dismiss For Lack Of Subject Matter Jurisdiction

Defendant first asks the Court to dismiss this action for lack of diversity jurisdiction. Plaintiff's sole basis for subject matter jurisdiction is diversity of citizenship, which requires complete diversity between all plaintiffs and defendants. See 28 U.S.C. § 1332; Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225 (10th Cir. 2004). Under Section 1332, a corporation is a citizen of the state of incorporation and the state of its principal place of business. A limited liability company is considered a citizen of each state of which its members are citizens. Birdsong v. Westglen Endoscopy Ctr., LLC, 176 F. Supp.2d 1245, 1248 (D. Kan. 2001); see generally Pramco,

LLC v. San Juan Bay Marina, Inc., 435 F.3d 51, 54 (1st Cir. 2006) (in every circuit to consider issue, citizenship of LLC determined by citizenship of members).

The complaint alleges that defendant (DRC) is a Minnesota corporation with its principal place of business in Minnesota, and that plaintiff (CAL) is a limited liability company formed under the laws of the Kansas with its principal place of business in Lawrence, Kansas. Defendant correctly points out that the complaint does not allege the citizenship of each member of CAL, and thus does not establish diversity jurisdiction. See Birdsong, 176 F. Supp.2d at 1248; Pramco, 435 F.3d at 54-55. In response to defendant's motion, plaintiff presents affidavit evidence that all members of CAL are citizens of Kansas, and thus CAL is a citizen of Kansas. Because defendant is a citizen of Minnesota and plaintiff is a citizen of Kansas, plaintiff has demonstrated diversity jurisdiction.[3]

II.     Motion To Dismiss Or Transfer For Lack of Venue Or To Stay Pending Arbitration

Defendant asserts that plaintiff's claims are subject to arbitration under the Teaming Agreement, which provides for arbitration in Minnesota. Defendant further points out that under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., venue to confirm an arbitration award lies only in the district where an arbitration award is made. See 9 U.S.C. § 9. Defendant asserts that the Court should dismiss for lack of venue, transfer venue to the United States District Court for the District of Minnesota, or stay the case pending arbitration. Plaintiff contends that its claims are based on the CAL Subcontract – not the Teaming Agreement – and are not subject to arbitration.

The FAA ensures that written arbitration agreements in transactions involving interstate commerce are "valid, irrevocable, and enforceable." 9 U.S.C. § 2. Federal policy favors arbitration

---

[3]     As noted, the complaint does not adequately allege facts sufficient to establish diversity jurisdiction. Where the pleadings are inadequate, the Court may review the record to determine whether diversity exists. See Gaines v. Ski Apache, 8 F.3d 726, 729 (10th Cir. 1993).

agreements and requires that the Court rigorously enforce them. Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987) (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985)). Normally, on a motion to compel arbitration under the FAA, the Court applies a strong presumption in favor of arbitration. ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995) (FAA evinces strong federal policy in favor of arbitration); see Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) (court should resolve any doubts concerning scope of arbitrable issues in favor of arbitration).

FAA Section 3 states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. The question of arbitrability – whether the parties agreed to arbitrate a particular dispute – is an issue for judicial determination. AT&T Techs., Inc. v. Comm'n Workers Of Am., 475 U.S. 643, 649 (1986). Before granting a stay or dismissing a case pending arbitration, the Court must determine that the parties have a written agreement to arbitrate. See 9 U.S.C. §§ 3 and 4; Avedon Eng'r, 126 F.3d at 1283. The existence of an arbitration agreement "is simply a matter of contract between the parties; [arbitration] is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943-45 (1995). The Court may compel arbitration only when satisfied that the making of the agreement is not at issue. Nat'l Am. Ins. Co. v. SCOR Reinsurance Co., 362 F.3d 1288, 1290 (10th Cir. 2004). Generally, state law principles of contract formation govern whether a valid

arbitration agreement exists. Hardin v. First Cash Fin. Servs., Inc., 465 F.3d 470, 475 (10th Cir. 2006).[4]

Plaintiff asserts that the arbitration clause in the Teaming Agreement does not apply to its to its claims because (1) the CAL Subcontract, not the Teaming Agreement, forms the basis for plaintiff's claims, and (2) the CAL Subcontract has no arbitration provision.[5] The document which plaintiff characterizes as the CAL Subcontract is essentially a spreadsheet which lists the tasks which plaintiff is to perform, the required delivery schedule and the specific prices which defendant

---

[4]      In a diversity action such as this one, the court applies the substantive laws and the choice-of-law rules of the forum state, which in this case is Kansas.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 495-97 (1941); Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005). Kansas courts generally honor choice-of-law provisions if the forum selected has some reasonable relationship to the contract at issue.  See Pepsi-Cola Bottling Co., 431 F.3d at 1255 (enforcing choice of law provision and applying New York law to contract claims).

Here, the Teaming Agreement contains a choice-of-law clause that declares the contract will be governed by Minnesota law. Doc. #8-1 at 5 ("[t]his Teaming Agreement shall be subject to and governed by the laws of the state of Minnesota").  DRC has its principal place of business in Minnesota, and the parties agree that interpretation of the Teaming Agreement is subject to Minnesota law.  See Defendant's Memorandum In Support (Doc. #8) at 4,11,12 n.3; Plaintiff's Memorandum In Opposition (Doc. #13) at 6.  The Court thus applies Minnesota law to interpretation of the Teaming Agreement. Plaintiff asserts that its claims arise not under the Teaming Agreement but under the CAL Subcontract and that the substantive law of Kansas applies in construing that contract.  See Plaintiff's Memorandum In Opposition (Doc. #13 at 6) (citing Philippine Am. Life Ins. v. Raytheon Aircraft Co., 252 F. Supp. 2d 1138, 1142 (D. Kan. 2003) (under Kansas choice of law rules, law of forum applies unless expressly shown that different law governs; in case of doubt, law of forum is preferred)).  Defendant correctly responds that whether Minnesota or Kansas law applies to the purported CAL Subcontract, the result is the same.

[5]      In the alternative, defendant contends that the CAL Subcontract is not enforceable under Minnesota or Kansas law because it is void as against the statute of frauds and does not include the essential terms of the agreement. Under Minnesota law, the question whether the parties have created a binding contract depends on their intent and is a question of fact. See Chergosky v. Crosstown Bell, 463 N.W. 2d 522, 525-26 (Minn. 1990). On the other hand, where the parties dispute "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy, [the question] is for the court." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002).

agreed to pay for stated products and services. Plaintiff points out that on its face, the CAL

Subcontract does not contain an arbitration clause. Defendant asserts that if the CAL Subcontract

is a valid, enforceable contract,[6] it includes an arbitration clause. Specifically, defendant contends

that the arbitration clause in the Teaming Agreement applies to the CAL Subcontract. The Teaming

Agreement provides in pertinent part as follows:

> Any subcontract hereunder made and executed between the parties concerning any
> project shall supersede and supplant the terms of this Teaming Agreement to the
> extent the terms or provisions of such subcontract conflict with the terms and
> provisions of this Teaming Agreement.

This provision clearly indicates that if the parties enter a subcontract as contemplated under the

Teaming Agreement, the terms of the Teaming Agreement apply to the subcontract *unless* the

subcontract contains terms or provisions which conflict with the terms and provisions of the

Teaming Agreement. Plaintiffs do not contend that the CAL subcontract contains a clause

concerning arbitration and have not shown that the subcontract contains a term or provision which

conflicts with the arbitration provision of the Teaming Agreement.

To determine whether a particular dispute falls within the scope of an agreement's arbitration

clause, a court undertakes a three-part inquiry, as follows:

> First, recognizing there is some range in the breadth of arbitration clauses, a court
> should classify the particular clause as either broad or narrow. Next, if reviewing a
> narrow clause, the court must determine whether the dispute is over an issue that is
> on its face within the purview of the clause, or over a collateral issue that is
> somehow connected to the main agreement that contains the arbitration clause.
> Where the arbitration clause is narrow, a collateral matter will generally be ruled
> beyond its purview. Where the arbitration clause is broad, there arises a presumption
> of arbitrability and arbitration of even a collateral matter will be ordered if the claim

---

[6]     The Court notes that in determining arbitrability, it is not to decide the merits of the
case.  AT & T, 475 U.S. at 649 (in deciding whether parties have agreed to submit particular
grievance to arbitration, court is not to rule on potential merits of underlying claims).

-11-

alleged implicates issues of contract construction or the parties' rights and obligations under it.

Cummings v. FedEx Ground Package Sys., Inc., 404 F.3d 1258, 1261 (10th Cir. 2005) (quoting

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001)).

Defendant correctly points out that the arbitration clause in the Teaming Agreement is broadly written, requiring that "[a]ny disagreement or dispute arising form or relating to the negotiation, formation or performance of this Teaming Agreement, including any attachment or exhibit hereto, shall be [subject to arbitration]." See, e.g., Spahr v. Secco, 330 F.3d 1266, 1270 (10th Cir. 2003) (describing as "broad" a provision to arbitrate "all disputes arising out of or relating to" contract); AT & T, 475 U.S. at 650 (presumption of arbitration particularly applicable where broad clause provides for arbitration of any differences arising with respect to interpretation of contract or performance of any obligation hereunder). When a contract contains a broad arbitration provision, any matters that touch the subject that is to be arbitrated should be arbitrated as well. See P & P Indus., Inc. v. Sutter Corp., 179 F.3d 861, 871 (10th Cir. 1999) (if allegations in complaint touch matters covered by arbitration clause, those claims must be arbitrated).

The Court finds that the arbitration clause in the Teaming Agreement applies to the CAL Subcontract. See Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1514-15 (10th Cir. 1995) (while party may not be compelled to submit dispute to arbitration unless it has agreed to do so, federal arbitration policy requires that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration).

As noted, the arbitration clause in the Teaming Agreement specifies that arbitration must occur in Minnesota. Based on the parties' agreement to arbitrate in Minnesota, defendant seeks

dismissal of plaintiff's complaint for improper venue under Fed. R. Civ. P. 12(b)(3) or, in the alternative, transfer of venue to the United States District Court for the District of Minnesota.[7]

Section 4 of the FAA provides in relevant part that

[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. §4. Many courts have considered that under the plain language of Section 4, a district court lacks the authority to compel arbitration in other districts, or in its own district if another has been specified for arbitration. See, e.g., Cont'l Cas. Co. v. Am. Nat. Ins. Co.,417 F.3d 727, 733 (7th Cir. 2005) (where forum selection clause specifies that arbitration must occur in venue outside court's judicial district, court should dismiss case for lack of venue under Fed. Civ. P. 12(b)(3)); Federated Rural Elec. Ins. Co. v. Nationwide Mut. Ins. Co., 874 F.Supp. 1204, 1209 -1210 (D. Kan. 1995) (Section 4 provides that party may petition any federal district court for order to compel arbitration; if court orders parties to proceed to arbitration, arbitration can take place only within district in which court is located); Alpert v. Alphagraphics Franchising, Inc., 731 F.Supp. 685, 689 (D.N.J. 1990) (agreement provided for arbitration in Arizona but plaintiff filed motion to compel arbitration in New Jersey; New Jersey district court complied with Section 4 by staying proceedings so that defendant could move Arizona court to compel arbitration there).

---

[7]     Defendant does not specify whether it seeks transfer of venue under 28 U.S.C. § 1404 or § 1406.

Although this Court has determined that the parties agreed to arbitrate this dispute, it has no power to compel them to arbitrate their dispute in Minnesota as agreed. Transferring the case to Minnesota will thus further the parties' intent as expressed in their agreements. See Bosworth v. Ehrenreich, 823 F.Supp. 1175, 1180 (D.N.J. 1993) (district court sitting in New Jersey, unable to compel arbitration in New York as provided in parties' agreement, transferred venue to Southern District of New York); Black & Veatch, 123 F.Supp.2d at 579 -580 (under 28 U.S.C. § 1406(a) "in the interests of justice" court may transfer to district where action might have been brought).

The Court concludes that the issues presented by the complaint are subject to arbitration. Further, because the FAA forbids the district court to compel arbitration outside the confines of the district, the Court finds that the action should be transferred to the United States District Court For the District Of Minnesota.

**IT IS THEREFORE ORDERED** that Defendant's Motion To (1) Dismiss Plaintiff's Complaint Under Rules 12(b)(1) and (3); (2) Transfer The Case To The United States District Court For The District Of Minnesota; Or In Th e Alternative (3) To Compel Arbitration Under The Federal Arbitration Act (Doc. #7) filed August 18, 2009 be and hereby is **SUSTAINED** in part. The case be and hereby is transferred to the United States District Court For The District Of Minnesota.

Dated this 19th day of March, 2010 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge